**UNITED STATES of America, Appellee,**

v.

**Scott C. CIAK, Defendant–Appellant.**

**No. 338, Docket 96–1217.**

United States Court of Appeals, Second Circuit.

Argued Sept. 18, 1996.

Decided Dec. 4, 1996.

---

Terence S. Ward, Assistant Federal Public Defender, Hartford, CT (Thomas G. Denis, Federal Public Defender, District of Connecticut, on the brief), for defendant–appellant.

Denise Derby, Assistant United States Attorney, New Haven, CT (Christopher F. Droney, United States Attorney, District of Connecticut, on the brief), for appellee.

Before: MESKILL, WINTER, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

In an earlier action before this Court regarding the same set of events, we granted the defendant, Scott C. Ciak's, petition for habeas corpus and vacated his conviction for possession of a firearm as a convicted felon

in violation of 18 U.S.C. § 922(g)(1), finding that he had received constitutionally deficient representation at trial. *Ciak v. United States,* 59 F.3d 296 (2d Cir.1995) (*Ciak I*). Following a second jury trial in the United States District Court for the District of Connecticut (Alfred V. Covello, *Judge*), the defendant was again convicted on this same charge, and he is now before us on direct appeal from that conviction. On appeal, he alleges that (1) the district court erred in denying his motion to suppress in-court identification testimony from Arthur Rancourt, an eyewitness to an incident in which the defendant is said to have wielded a handgun, on the ground that Rancourt was subjected to suggestive pre-trial identification procedures; (2) the court violated Ciak's rights under the Sixth Amendment's Confrontation Clause by permitting the introduction of testimony from a now-unavailable witness taken at Ciak's earlier trial, at which Ciak had constitutionally inadequate representation; (3) the court included several erroneous instructions in its charge to the jury: (a) allegedly suggesting that the presumption of innocence and the reasonable doubt standard are not applicable to the guilty, (b) failing to instruct the jury as to the defendant's duress defense, (c) charging the jury not to draw any inferences from the failure of either party to summon Michael Reed, the individual whom Ciak allegedly threatened with a weapon, and (d) providing an improper instruction on 18 U.S.C. § 922(g)(1)'s "interstate commerce" requirement; and (4) the Government presented insufficient evidence to satisfy this "interstate commerce" requirement.

We find these claims to be without merit. First, we conclude that any error in the district court's decision to permit Rancourt's in-court identification testimony was harmless. Second, we find that the court's decision to admit past testimony from a currently unavailable witness did not violate the defendant's Sixth Amendment Confrontation Clause rights; while defense counsel had a conflict of interest, his cross-examination of the now-unavailable witness conferred the requisite "indicia of reliability" upon the witness's testimony. Finally, the court did not commit plain error in instructing the jury that the reasonable doubt standard and the

presumption of innocence "are designed to protect the innocent and not the guilty." As for the defendant's remaining claims on appeal, not discussed in this opinion, we have reviewed each of these claims and find them all to be without merit. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

On the evening of April 12, 1991, at approximately 9:00 o'clock, police received a call from Arthur Rancourt, at that time a resident of an apartment building in East Hartford, Connecticut, reporting that a man in the parking lot outside Rancourt's window had pulled a gun on another man and threatened to kill him. Rancourt recognized the threatened man as Michael Reed, and he described the gunman to the police dispatcher as a white male with long hair in a ponytail wearing an "8–ball" jacket (apparently a jacket with a depiction of an 8–ball on it). As Rancourt was relating the events in the parking lot to the police dispatcher, four of the people in the parking lot, including the gunman, left the scene in two vehicles—a white Trans Am and a black Mustang. Rancourt told the dispatcher that the gunman was driving the Trans Am with a female passenger whom Rancourt took to be the driver's girlfriend.

A police officer in the vicinity of the parking lot at the time of Rancourt's call saw the two cars pull out of the parking lot. After following the cars for a short distance, the officer turned on his blue flashing lights; at which point only the black car pulled over. The defendant's sister, Kristine Ciak, her former boyfriend, David Santos, and their young child were in the black car.

Another police officer stopped the white Trans Am a short distance away. The defendant, Scott Ciak, was driving the car. He was wearing what the officer later described as a jacket with an "eight ball" on the back. Ciak's girlfriend, Rebecca Durosette, was also in the white car. Ciak informed police officers on the scene that there was a weapon underneath the driver's seat, but insisted that it was not his. Police searched the vehicle and found two firearms under the

front seat, a .38 caliber Colt revolver and a 9mm Brevete semiautomatic pistol.

The Government charged the defendant with knowing possession of one of the guns, the 9mm Brevete, as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Ciak was indicted on this charge and, in December 1991, was tried before a jury in the United States District Court for the District of Connecticut (T. Emmet Claire, *Judge*). The jury found the defendant guilty, and this court affirmed the conviction on direct appeal.

Ciak filed a *pro se* petition for habeas corpus in the district court on August 17, 1993, alleging, *inter alia*, that his attorney, Jacob Wieselman, had had a number of conflicts of interest that precluded him from effectively representing Ciak. The district court denied Ciak's petition, but we reversed on appeal, concluding that the trial court erred in failing to conduct an evidentiary hearing on the conflict of interest issue in light of available evidence of Wieselman's prior and ongoing dealings both with Kristine Ciak and with Michael Reed, the man whom the defendant allegedly threatened in the parking lot and a witness for the prosecution. *See Ciak I,* 59 F.3d at 304–07.

Following our decision vacating the defendant's conviction, the second Ciak trial began before Judge Covello on December 8, 1995. The Government alleged at trial that Ciak had knowingly possessed the 9mm Brevete on April 12, 1991, focusing much of its case on the incident in which Ciak had allegedly threatened Michael Reed with this weapon in the parking lot. At trial, the Government presented testimony from Arthur Rancourt, during which he identified Ciak in court as the man who had threatened Reed. The Government also introduced a transcript, taken from the first trial, of the testimony of Steven Reed, Michael Reed's cousin and one of the people present in the parking lot when the alleged incident took place. Steven Reed had died in the interim between the two Ciak trials. In his testimony, Steven Reed identified the defendant as the man who threatened Michael Reed in the parking lot, and described an incident earlier on the same day in which Ciak had shown him various hand-guns, including the 9mm weapon in question, while the two were driving through Hartford with Michael Reed. Michael Reed, the alleged victim of the defendant's threats in the parking lot, did not testify at the second trial.

The defendant, acting *pro se* at his second trial (but with "standby" counsel appointed by the court available to him at all times), denied having been the man who threatened Michael Reed in the parking lot. While he admitted to being in the lot at the time of the incident, he argued that it was David Santos, his sister's former boyfriend, who had threatened Michael Reed with a handgun. As for the weapons that were in the white Trans Am when he was stopped by police, Ciak claimed that his sister Kristine had placed these weapons in the vehicle without his knowledge, and that Durosette had only informed him of their presence in the car as he was being pulled over by police. Durosette also testified for the defense, stating that she believed Kristine Ciak had placed the weapons in the car.

On December 18, 1995, the jury convicted Ciak of knowingly possessing the 9mm handgun as a convicted felon. He was subsequently sentenced to 188 months' imprisonment and five years of supervised release. This appeal of the judgment, without objection to the sentence, followed.

## II. DISCUSSION

### A. *Arthur Rancourt's In–Court Identification Testimony*

■ The defendant argues that the district court violated his Fifth Amendment right to due process when it denied his motion to suppress Arthur Rancourt's in-court identification of Ciak as the man who had threatened Michael Reed in the parking lot. The defendant contends that Rancourt's identification testimony was unreliable because Agent Zane Roberts of the U.S. Bureau of Alcohol, Tobacco, and Firearms exposed Rancourt to unduly suggestive identification procedures on two occasions prior to Ciak's first trial.

The first incident occurred soon after the events of April 12, 1991. Roberts met with Rancourt in an effort to elicit a positive

identification of Ciak as the man who had threatened Michael Reed. Rancourt failed to select Ciak's picture out of a photo array, however, choosing another photograph instead. At this point, Agent Roberts apparently picked out Ciak's photo and identified it as a picture of Scott Ciak, the individual being held for threatening Reed. In a second incident, which occurred just before Rancourt testified at the first Ciak trial, Rancourt apparently noticed the defendant's driver's license on Roberts's desk, at which point Roberts allowed him to examine it and Rancourt identified the picture as that of the defendant.

■ We review a district court's decision to admit identification evidence for clear error. *United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir.1992). Where, as here, there is the potential taint of suggestive pre-trial identification procedures, the court must decide whether to permit an in-court identification by weighing the degree of suggestiveness of these procedures against "factors suggesting that [the] in-court identification may be independently reliable rather than the product of the earlier suggestive procedures." *United States v. Maldonado–Rivera,* 922 F.2d 934, 973 (2d Cir.1990); *see also Neil v. Biggers,* 409 U.S. 188, 199–201, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972); *Dickerson v. Fogg,* 692 F.2d 238, 244–45, 247 (2d Cir.1982); *Solomon v. Smith,* 645 F.2d 1179, 1185 (2d Cir.1981). Accordingly, even where a witness is subject to suggestive pre-trial identification procedures, the court may still admit the witness's in-court identification testimony if it concludes that this identification is independently reliable, *United States v. Thai,* 29 F.3d 785, 808 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994), although a strongly suggestive pre-trial identification procedure necessarily makes it difficult for the reviewing court to find such independent reliability, *see Dickerson,* 692 F.2d at 247.

In this case, the Government concedes, as it must, that Roberts employed unduly suggestive pre-trial procedures with Rancourt, but maintains that Rancourt's in-court identification of the defendant was independently reliable. *See* Brief for Appellee at 13. We need not decide, however, whether the indicia of independent reliability identified by the Government in fact overcome the conceded suggestiveness of Roberts's pre-trial procedures. In light of the substantial evidence presented at trial demonstrating that the defendant threatened Michael Reed—even without considering Rancourt's in-court identification—we conclude that any district court error in admitting the identification testimony was harmless.

■ To find that a constitutional error was harmless, a reviewing court must conclude that "there was no reasonable possibility that the evidence complained of might have contributed to the conviction ... and that the error was harmless beyond a reasonable doubt." *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir.1993) (internal quotation marks and citations omitted); *see also United States v. Concepcion,* 983 F.2d 369, 379–80 (2d Cir.1992) (concluding that, even if admission of in-court identification of defendant by murder witness was clear error, it was "harmless beyond a reasonable doubt" in light of second eyewitness's identification and other evidence suggesting defendant's guilt). Several factors lead us to conclude that the admission of Rancourt's identification testimony, even if erroneous, was harmless by this standard. Significantly, Rancourt's own testimony, even without the in-court identification, provided substantial evidence that the defendant had threatened Michael Reed in the parking lot. In his testimony, Rancourt recalled the description of the gunman that he had provided to the police dispatcher—that he had a blond pony tail, was wearing an "eight-ball" jacket, and left the scene driving a white Trans Am with a female passenger. An officer who observed the Trans Am leave the parking lot then relayed the position of the car; a car matching that description and traveling along the same route was then pulled over by another officer. Inside the car was the defendant, with what the arresting officer described as long, blond hair and an "eight-ball" jacket, accompanied by his girlfriend, Rebecca Durosette.

Nor was Rancourt the only witness implicating the defendant. In testimony from the first Ciak trial that the Government intro-

duced at the second trial, Steven Reed provided his version of the same scene that Rancourt had observed—the defendant pointing a gun at the head of Michael Reed. Steven Reed also testified that earlier on that same day the defendant showed Steven Reed two weapons, including a 9mm pistol.

Moreover, the defendant, first in cross-examining Rancourt and later in his closing statement, emphasized that, after Rancourt selected a picture other than Ciak's from the photo array, Agent Roberts identified Ciak's picture as that of the suspected offender, and that Agent Roberts later permitted Rancourt to view Ciak's driver's license photo. The jury can be expected to have discounted Rancourt's in-court identification testimony in light of this information. Indeed, during deliberations, the jury requested evidence of the description of the suspect that Rancourt provided to the police dispatcher, suggesting that the jurors found Rancourt's contemporaneous description of the offender more compelling than his in-court identification more than four years later.

In sum, we conclude that the jury in this case had before it ample evidence—even *without* Rancourt's in-court identification—establishing that Ciak threatened Michael Reed with a pistol. Accordingly, any error the district court may have committed in admitting Rancourt's identification testimony was harmless beyond a reasonable doubt.

**B.** *Admissibility of Steven Reed's Testimony*

■ Steven Reed, an important Government witness at the first Ciak trial, died prior to Ciak's second trial. At the second trial, however, the Government successfully moved, over the defendant's objection, to have the court read Steven Reed's testimony from the first trial to the jury pursuant to FED.R.EVID. 804(b)(1).[1] The defendant argues on appeal that the court erred in admit-

ting this testimony. He contends that, given our finding in *Ciak I*, 59 F.3d at 296, that his attorney in the first trial had a conflict of interest, the introduction of this testimony at the second trial violated his rights under the Sixth Amendment's Confrontation Clause.[2]

■ The Confrontation Clause requires that, where prior testimony is admitted at a later proceeding, the party against whom the testimony is admitted must have had an opportunity to cross-examine the witness at the earlier proceeding sufficient to endow the testimony as a whole with some "indicia of reliability"; "the trier of fact [must have] a satisfactory basis for evaluating the truth of the prior statement." *Mancusi v. Stubbs*, 408 U.S. 204, 216, 92 S.Ct. 2308, 2315, 33 L.Ed.2d 293 (1972) (internal quotation marks and citation omitted). *Compare Ohio v. Roberts*, 448 U.S. 56, 70–73, 100 S.Ct. 2531, 2541–43, 65 L.Ed.2d 597 (1980) (upholding admission of testimony from preliminary hearing where witness was unavailable at trial and Court concluded from hearing transcript that, although adverse party's counsel had conducted direct examination of the witness at the hearing, counsel's questioning was the equivalent of cross-examination), *and Mancusi*, 408 U.S. at 214–16, 92 S.Ct. at 2313–15 (on collateral review, upholding admission at retrial of testimony from prior trial, notwithstanding fact that there had been ineffective assistance of counsel at first trial, where there had been adequate cross-examination of now-unavailable witness), *with Pointer v. Texas*, 380 U.S. 400, 406–08, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923 (1965) (finding no "complete and adequate opportunity to cross-examine" where prior testimony was taken from preliminary hearing at which criminal defendant was not represented by counsel and had not conducted any cross-examination of witness), *and United States v. Wingate*, 520 F.2d 309, 315–17 (2d Cir.1975) (upholding lower court's refusal to admit testimony from

---

1. FED.R.EVID. 804(b)(1) provides an exception to the rule against the admission of hearsay evidence for "[t]estimony given as a witness at another hearing of the same or a different proceeding ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

2. U.S CONST. amend. VI provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...."

prior suppression hearing that had focused on different issue such that Government had not cross-examined on now-relevant issue at earlier hearing).

The defendant urges us to find that Attorney Wieselman's cross-examination of Steven Reed at the first trial was constitutionally inadequate *per se* because of the difficulty in determining the limits to the effect of Wieselman's conflict of interest. *See* Brief of Defendant–Appellant at 32. We decline the invitation to adopt so broad a rule. Rather, following the approach now well-established in applicable precedent, we look to the actual transcript of Steven Reed's testimony—in particular to Wieselman's cross-examination of Reed—to determine whether the cross-examination imbues the testimony with the requisite "indicia of reliability." *See, e.g., Roberts*, 448 U.S. at 70–71, 100 S.Ct. at 2541–42; *Mancusi*, 408 U.S. at 214–16, 92 S.Ct. at 2313–15. Our review of the transcript in the instant case convinces us that Wieselman's cross-examination easily imbues Reed's testimony with the reliability necessary to survive the defendant's Confrontation Clause challenge. Indeed, the transcript reveals a serious effort by Wieselman to undermine and discredit Reed's testimony. Wieselman questioned Reed about certain inconsistencies between his testimony on direct examination and his reports to the police; inconsistencies between his testimony and the physical evidence; and Reed's failure to report certain incidents to the police. Wieselman also elicited testimony on Reed's own criminal record that had not come out on direct examination. Reviewing the transcript of the cross-examination as a whole, we find that Wieselman's examination of Reed imbued Reed's testimony with sufficient indicia of reliability.

Moreover, while we are mindful of the practical difficulty inherent in any attempt to assess the "precise effect ... of representation corrupted by conflicting interests," *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), it is relevant that Steven Reed was in no way involved in the actual or potential conflict of interest that we identified in *Ciak I*, and Wiesleman's examination of Steven Reed

played no part in our decision to grant Ciak's petition for habeas corpus. Rather, the conflict at issue in *Ciak I* stemmed from the fact that Wieselman had represented both Kristine Ciak and her then-fiancé, Michael Reed, in forfeiture proceedings involving the white Trans Am impounded when the police apprehended Scott Ciak. *Ciak I*, 59 F.3d at 298–99. Wieselman also had an interest in the car itself. If Kristine Ciak regained possession of the vehicle, she had agreed to sell it and use the funds to pay Wieselman for representing the defendant. *Id.* at 299. By the time of the defendant's criminal trial, Wieselman had successfully recovered the vehicle for Kristine Ciak, but the car had then been stolen from her, allegedly by Michael Reed. *Id.* In granting the defendant's petition for *habeas corpus,* we were thus concerned primarily with Wieselman's cross-examination of *Michael Reed,* a key Government witness, in which Wieselman focused for some time on the location of the missing car, an issue that was irrelevant to Scott Ciak's criminal case. *Id.* at 299–300. Wieselman also examined Michael Reed about statements Michael Reed had made to Wieselman in the course of the forfeiture litigation, thereby introducing Wieselman's own recollections as unsworn testimony. *Id.* at 300, 304–05. In addition, we feared that Wieselman's stake in the vehicle may have influenced his decision not to summon Kristine Ciak as a witness at her brother's criminal trial. Kristine was apparently willing to testify that she had placed the two handguns in the white Trans Am, an admission that, although helpful to the defendant, might have triggered new forfeiture proceedings and jeopardized her right to retain possession of the car. *Id.* at 305–06. These actual and potential defects in Wieselman's representation, while serious, did not extend to Wieselman's cross-examination of Steven Reed.

Finally, the defendant argues that Wieselman improperly refrained from objecting to certain hearsay statements made by Steven Reed on direct examination. This argument is unavailing. The defendant himself made no such objections *prior to* or *during* the reading of the testimony to the jury in the second case. An objection at either point

would have permitted Judge Covello to refrain from reading aloud any portions of the Reed testimony constituting inadmissible hearsay. Instead, the defendant raised a hearsay objection, aimed at Reed's direct testimony as a whole, only after the court had finished reading Steven Reed's complete testimony to the jury. To vacate the conviction based on the jury's exposure to hearsay evidence would be inappropriate where the defendant could have prevented this exposure with a timely objection. *See generally United States v. Scarpa*, 913 F.2d 993, 1020 (2d Cir.1990) (noting contemporaneous objection requirement to preserve matter for appeal).

█ Accordingly, we find no violation of the defendant's rights under the Confrontation Clause in the district court's decision permitting the Government to introduce Steven Reed's prior testimony. Nor, as the defendant suggests in the alternative, can we find that Judge Covello should have denied the Government's request to introduce Steven Reed's testimony as unfairly prejudicial under FED.R.EVID. 403.

## C. *The District Court's Jury Instructions*

█ The defendant next argues that the district court committed reversible error when it instructed the jury as follows:

> I want to remind you again that it's the sworn duty of the courts and jurors to safeguard the rights of persons charged with crimes by respecting the presumption of innocence which the law imputes to every person so charged and by making the government meet its burden of proving guilt beyond a reasonable doubt. *You must keep in mind that those rules of law are designed to protect the innocent and not the guilty.* If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that the accused is guilty of the crime charged, then it's your sworn duty to enforce the law and render a verdict of guilty. (Emphasis supplied.)

In particular, Ciak alleges that the highlighted sentence misstates the law by suggesting that the reasonable doubt standard and the presumption of innocence apply only to the

innocent. *See* Brief for Defendant–Appellant at 38.

█ Because the defendant failed to object to this charge at the time it was rendered, we review the allegedly erroneous language only for plain error. *United States v. Birbal*, 62 F.3d 456, 459 (2d Cir.1995). We find no such error in Judge Covello's use of the disputed language in the instant case.

While several circuits have found that language similar to that highlighted in the above-quoted passage is objectionable, *United States v. Bifield*, 702 F.2d 342, 351 (2d Cir.1983) (citing cases), and we have noted that "it is better practice to avoid using language" to this effect, *id.*, we have nevertheless held that such language is not grounds for reversal, *id.* (citing *United States v. Farina*, 184 F.2d 18 (2d Cir.1950)). In fact, the entire portion of the district court's jury charge quoted above matches almost verbatim the language we upheld against a similar challenge in *Bifield*, 702 F.2d at 350 n. 4. In that case, we concluded that the reference to burden-of-proof standards as a means of protecting the innocent, not the guilty, did not "dilute the presumption of innocence to which the appellant is entitled" and, accordingly, did not constitute error. *Id.* at 351. In so holding, we identified two factors that sufficiently mitigated any harm resulting from the challenged language: (1) "[t]he court instructed the jury specifically and repeatedly that [the defendant] was innocent when presented for trial and continued to be innocent until such time, if ever, as the government proved his guilt beyond a reasonable doubt," and (2) "[t]he court stressed that Bifield did not have to prove his innocence, but rather that the government had to prove his guilt." *Id.* Judge Covello included similar warnings in both his preliminary and his final instructions to the jury in this case. He noted in his final instructions, for example, that the presumption of innocence "was with the defendant when the trial began . . . . [and] [i]t remains with him now as I speak to you and will continue with the defendant into your deliberations unless and until you are convinced that the Government has proven the defendant's guilt beyond a reasonable doubt."

The defendant argues that this case is distinguishable from *Bifield* due to the *added* confusion arising from Judge Covello's statement in his preliminary instructions that if the jury believed that "that there's a real possibility that [the defendant is] not guilty, [the jury] must give him the benefit of the doubt and find him not guilty." Courts in this circuit, however, while acknowledging that the "real possibility" language is potentially confusing to jurors, have repeatedly held that its use in the jury charge is not grounds for reversal. *See, e.g., United States v. Reese*, 33 F.3d 166, 172 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 756, 130 L.Ed.2d 655 (1995). Moreover, Judge Covello employed this language only in the instructions he gave prior to the presentation of evidence, and in his final charge to the jury he explained the reasonable doubt standard using language that the defendant concedes was proper. *See* Brief for Defendant–Appellant at 41.

Finally, the defendant contends that this case is distinguishable from *Bifield* because in the instant case the jury required an *Allen* charge before rendering its verdict. We find no basis for drawing a distinction along these lines.

Accordingly, we find no error, much less plain error, in the district court's use of the language at issue in its jury charge.

### III. CONCLUSION

In sum:

(1) We conclude that any error in the district court's decision to allow Rancourt's in-court identification testimony was harmless.

(2) Because defense counsel performed an adequate cross-examination of Steven Reed at Ciak's earlier trial, the introduction of Reed's testimony at the second trial did not contravene Ciak's Confrontation Clause rights.

(3) The district court committed no error—plain or otherwise—in instructing the jury that the reasonable doubt standard is "designed to protect the innocent and not the guilty."

(4) Finally, we have reviewed the defendant's remaining challenges to the district court's jury instructions, as well as his Commerce Clause claim, and we find them to be without merit.

The judgment of the district court is affirmed.